IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL ACTION NO.:   4:24-cv-4346-JD |
| Plaintiff, | ) | |
| v. | ) | |
| $415,104 IN UNITED STATES CURRENCY, | ) | |
| Defendant *in Rem*. | ) | |

**UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

The Plaintiff, United States of America, brings this complaint and alleges as follows, in accordance with Rule G(2) of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions.

**NATURE OF THE ACTION**

1. This is a civil action *in rem* to forfeit to the United States of America funds in the amount of $415,104 in U.S. currency ("Defendant Currency"), pursuant to 21 U.S.C. § 881(a)(6), 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 981(a)(1)(A). The United States seeks forfeiture based upon a reasonable belief that the Government will be able to meet its burden of proof at trial to show that the Defendant Currency constitutes, or is traceable to:

   a.   money furnished or intended to be furnished in exchange for a controlled substance, in violation of the Controlled Substances Act; proceeds traceable to such an exchange; or money used and

          intended to be used to facilitate a violation of the Controlled Substances Act;

b.     property involved in money laundering transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and/or § 1956(a)(1)(B)(i) and/or 1957;

c.     property involved in an illegal money transmitting business, in violation of 18 U.S.C. § 1960; and/or

d.     proceeds of some other form of specified illegal activity set forth in 18 U.S.C. § 1956.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. § 1345, and over an action for forfeiture by virtue of 28 U.S.C. § 1355. This Court has *in rem* jurisdiction over the Defendant Currency pursuant to:

(a)     28 U.S.C. § 1355(b)(1)(A), because acts or omissions giving rise to the forfeiture occurred in the District of South Carolina; and

(b)     28 U.S.C. § 1355(b)(1)(B), because venue properly lies in this district pursuant to 28 U.S.C. § 1395.

## THE DEFENDANT *IN REM*

3.  The Defendant Currency consists of $415,104 in United States currency seized by officers of the Florence County Sheriff's Office (FCSO), on March 25, 2024, in Florence County, South Carolina.

4.  Custody of the Defendant Currency was subsequently transferred to Homeland Security Investigations ("HSI"), then to the United States Customs and Border Protection ("CBP").

5.  The Defendant Currency is currently on deposit in this district in an account under the control of the CBP.

6.  In accordance with the provisions of 19 U.S.C. § 1606, the Defendant Currency has a total domestic value of approximately $415,104.

## KNOWN POTENTIAL CLAIMANTS

7.  The known individuals whose interests may be affected by this litigation are:

    a.  Heng Cao may have an interest in the Defendant Currency because he claimed ownership of the Defendant Currency and he filed an administrative claim with the CBP on May 13, 2024, contesting administrative forfeiture of the Defendant Currency.

    b.  Mei Chai Lin may have an interest in the Defendant Currency because she claimed ownership of the Defendant Currency and she

3

filed an administrative claim with the CBP on May 13, 2024, contesting administrative forfeiture of the Defendant Currency.

## BASIS FOR FORFEITURE

8.   Pursuant to the pleading requirements of Supplemental Rule G(2)(f), Plaintiff alleges that there is a factual basis to support a reasonable belief that the Government will be able to meet its burden of proof at trial to show that the Defendant Currency is subject to forfeiture to the United States, based in part upon the following:

   a.   Interstate 95 ("I-95") is a known corridor for the transportation of illegal drugs and drug-related currency along the eastern seaboard of the United States. Florida is a "Source state" for illegal drugs; that is, Florida is a principal source of supply for large-scale quantities of drugs for re-distribution along the East Coast, and throughout the Southeastern United States. It is common for illegal drugs obtained in Florida to be re-distributed to primary demand locations, including the state of New York. The drug trafficking business is primarily an all-cash business, which necessitates that those involved in drug trafficking often possess large amounts of currency.

       Those involved in transporting drugs and drug-related currency are typically involved in drug runs of long distance and relatively short duration. During and after law enforcement traffic stops, it is common for those involved in transporting illegal drugs and/or drug-related currency to give false, changing, inconsistent, and/or incomplete explanations regarding the nature and purposes of the trip, the source of currency located during a stop, and the reasons for possessing a large amount of currency. It is also common for those transporting illegal drugs and/or drug related currency to initially deny the presence or extent of such materials to police during a traffic stop .It is common for those involved in drug trafficking, and the related laundering of drug proceeds, to use businesses in an effort to launder funds. It is also common in the drug trafficking business for money to be bundled in increments, depending on the size of the transaction. Such bundling of currency makes it easy for a buyer to exchange a specified amount of bundles for a specified amount of drugs and eliminates the need to count each and every bill, particularly among individuals familiar with each other.

b.   Corporal Tyler Nicholson ("Corporal Nicholson") of the Florence County Sheriff's Office ("FCSO") has extensive training and experience in the interdiction of illegal drugs and drug-related

5

|   |   |
|---|---|
|   | currency, as well as with traffic violations and related traffic stops. While on patrol on March 25, 2024, Corporal Nicholson observed a 2017 blue Honda Odyssey minivan with a Florida license plate traveling Northbound on 1-95 near mile marker 163 at a high rate of speed. Corporal Nicholson paced the vehicle at 67 miles per hour in a 60 miles per hour zone. Corporal Nicholson then initiated a traffic stop. Once the vehicle was pulled over and stopped, Corporal Nicholson approached the vehicle. The driver was identified as Heng Jian Cao ("Cao"). The front seat passenger was identified as Mei Chain Lin ("Lin"). Corporal Nicholson asked for Cao's driver's license, registration, and insurance. Cao fumbled with the insurance paperwork for a few minutes. Corporal Nicholson asked Cao if the vehicle belonged to him. Cao stated that the vehicle was his. Corporal Nicholson asked Cao to join him at his patrol vehicle to conduct the traffic stop. On the way back to the patrol vehicle, Corporal Nicholson noticed one designer bag in the back seat and a single suitcase in the back seat. |
| c. | Corporal Nicholson and Cao both sat in the front seats of the patrol car. Corporal Nicholson conversed with Cao while he was inputting information for the traffic stop in his computer. Corporal Nicholson explained the reason for the stop. Cao admitted to driving 65 miles |

6

per hour in a 60 miles per hour speed zone. Corporal Nicholson then confirmed with Cao that the address on the driver's license was accurate. Cao stated that the address on the driver's license is still his current living address. Cao stated that his address is close to Jacksonville, Florida. Cao stated that he was traveling to New York with his wife. Corporal Nicholson asked Cao what part of New York he was visiting. Cao replied, I am just going to visit my friend. Corporal Nicholson again asked, what part of New York? Cao responded, Uhhh ... New York City. Corporal Nicholson readdressed the question by asking, what part of New York, stating Queens, Brooklyn? Cao quickly stated, Queens. Cao then stated that the passenger was his wife of three years. Corporal Nicholson asked Cao what kind of work he did. Cao stated that he owns a small business. Cao said that he owned two restaurants in the Jacksonville, Florida area. Cao said that he was just going to be in New York for a few days staying a friend's house. It appeared that Cao did not want to provide specifics about his travel plans. Cao stated that he was going to stay at a friend's house just to go to a meeting contradicting his original statement of going to visit a friend. Corporal Nicholson again confirmed that the vehicle belonged to Cao. Cao stated that the car belonged to his company,

7

Akayayheguo. Corporal Nicholson asked Cao if he had any drugs or firearms in the vehicle. Corporal Nicholson named a list of drugs, all which Cao answered in the negative. Corporal Nicholson then asked if there were any large amounts of currency in the vehicle. Cao denied having any large amounts of currency. However, as Corporal Nicholson was inputting information into his computer, Cao's eyes began to blink rapidly, or twitch and Cao repeatedly rubbed his eyes. Corporal Nicholson asked Cao when he and Lin had left Florida on their trip. Cao responded that it had been around 1:00 am. Corporal Nicholson then asked Cao if he was just going to New York to visit his friend. Cao answered that he was. Corporal Nicholson asked the name of the friend they were visiting. Cao visibly struggled to answer that question, stuttering, and stammering and blinking rapidly. After about twenty seconds, Cao asked Corporal Nicholson if he wanted to know his friend's English name or her "real" name, as if stalling for time. Corporal Nicholson asked for the English name and Cao said it was "Angela." Corporal Nicholson then asked for the friend's given name and Cao gave a Chinese name, that sounded like Mei Fin, and stated that "our country always has the two names." Cao said his wife was working in the restaurant too, and that it is a small business.

8

d. Corporal Nicholson then asked Cao for consent to search the vehicle. Cao gave his consent. Corporal Nicholson again asked if there were any drugs or large sums of money in the vehicle. Cao responded, no, to both questions. Corporal Nicholson then Cao asked how often he visited his friend. Cao said, he had not seen her in a long time, probably 4 years. When Corporal Nicholson asked why they were visiting now, Cao stated that he just sold his business. Cao said he now just has one business as he sold the other to someone local, because running two businesses was too much work. Cao said he ran the old business for 15 years and the new one for about a year and a half. Corporal Nicholson asked Cao to stand by the front of his patrol car.

e. Corporal Nicholson then spoke to Lin. He asked Lin where they were going. Lin said to New York to visit her friend. Corporal Nicholson asked the friend's name and Lin stated a name that sounded like Lei Fin. Lin then stated that she has her own friend and Cao has his own friend. Corporal Nicholson asked what part of New York they were going to. Lin said Flushing. Lin stated that they were from Jacksonville and that she worked in a restaurant.

f. FCSO Corporal Rauch and FCSO Sergeant Braxton (an HSI Task Force Officer), have extensive training and experience in the

9

      interdiction of illegal drugs and drug-related currency, as well as with traffic violations and related traffic stops, responded to the scene to assist. A search of the vehicle disclosed a Coach bag. Inside the Coach bag was a Costco bag containing approximately $100,000.00 in U.S. currency. The currency was in bricks of $10,000.00 increments, bound with multi-colored rubber bands. The Costco bag contained shipping labels indicating that it had been mailed from California to a recipient identified as "Meichai Lin" at 1075 Oakleaf Plantation Pkwy, Orange Park, Florida, which is the address for the Akaya Grill & Sushi Restaurant associated with Cao and Lin. Smaller rubber banded bundles of U.S. Currency were found in a small brown Luis Vuitton shoulder bag located on the floor behind the driver's seat. Another large amount of U.S. currency was found inside of a pillow next to a blanket in the back seat of the vehicle. The pillow was extremely heavy. It was found to contain U.S. currency in bricks of $10,000 increments using multi-colored rubber bands. An additional smaller bundle of U.S. currency was on Cao's person in his pants pocket.

g.   Cao told Corporal Rauch that there was approximately $400,000 in currency. Cao told Corporal Nicholson that the money was from the sale of his business. Corporal Nicholson asked Cao why he would

      not deposit the money in the bank after the sale of his business instead of transporting it from Florida to New York. Cao stated that he has a lot of banks in New York and that he had it just in case he bought a house and moved to New York which was not previously mentioned in any prior conversation when Cao was asked about travel plans.   Cao then stated that he was bringing the money to try to buy a house in New York and that they were going to look at townhouses. He said that they were only going to be in New York a few days. Separately, Lin also provided Sergeant Braxton with a new explanation for their trip, stating that the money was intended to help a friend buy a house. Lin was emphatic that she and Cao were not moving to New York, nor leaving Jacksonville. She said they were visiting for about a week. She said that despite a planned week visit, Cao had not brought clothes and, when asked about it, she said that he might buy clothes in Chinatown. Corporal Nicholson had reason to believe with the totality of the circumstances that the bulk currency derived from criminal proceeds due to the overwhelming indicators of criminal activity.

h.    Cao was advised that the currency was being seized by HSI. The seizure process was explained to Cao, and he was provided a property receipt for the seized funds. The currency was transported

|      | to the Florence County Narcotics Office where it was placed into a cardboard box for a free air sniff to be conducted by a K-9. |
|------|---|
| i.   | At the Florence County Narcotics Office, Corporal Rauch deployed his K-9 partner "Dukat". Corporal Rauch and Dukat have been involved in several dog alerts which resulted in the location and seizure of illegal drugs. Corporal Rauch and Dukat have been certified through American Police Canine Association in narcotics detection (marijuana, cocaine, heroin, methamphetamine, and their derivatives). Dukat is trained to alert (i.e., to react) to the odor of chemicals associated with marijuana, cocaine, heroin, methamphetamine, or anything derived from these substances. Dukat alerted for the presence of narcotics on the box into which the currency had been placed. |
| j.   | The currency was then taken to Synovus Bank. A final count determined that the Defendant Currency totaled $415,104 and was comprised of the following denominations: |

- 3,819 one hundred-dollar bills ($381,900.00)
- 633 fifty-dollar bills ($31,650.00)
- 66 twenty-dollar bills ($1,320.00)
- 7 ten-dollar bills ($70.00)
- 19 five-dollar bills ($95.00)

- 69 one-dollar bills ($69.00)

This distribution of denominations is typical of currency that is the proceeds of drug trafficking.

    k.    Pursuant to 18 U.S.C. § 981, HSI seized the currency. The Defendant Currency was converted to a check made payable to CBP in the amount of $415,104.

    l.    HSI Special Agent Christopher Michocki subsequently attempted to identify the sender of the Costco bag. He advised that he was unable to locate anything for the California shipping address on the Costco bag and that it is likely a "ghost address."

9.    Based on the information and allegations set forth herein, there is a factual basis to support a reasonable belief that the Government will be able to meet its burden of proof at trial to show that the Defendant Currency constitutes, or is traceable to:

    a.    money furnished or intended to be furnished in exchange for a controlled substance, in violation of the Controlled Substances Act; proceeds traceable to such an exchange; or money used and intended to be used to facilitate a violation of the Controlled Substances Act;

b.  property involved in money laundering transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and/or § 1956(a)(1)(B)(i) and/or 1957;

c.  property involved in an illegal money transmitting business, in violation of 18 U.S.C. § 1960; and/or

d.  proceeds of some other form of specified illegal activity set forth in 18 U.S.C. § 1956.

## CONCLUSION

10.  By reason of these premises, and pursuant to 18 U.S.C. § 981(f) and 21 U.S.C. § 881(h), whereby the Plaintiff's right, title and interest in and to the Defendant Currency relates back to the commission of the act giving rise to the forfeiture, the Defendant Currency has become and is forfeited to the United States of America, to be disposed of pursuant to Supplemental Rule G(7)(c) for Admiralty or Maritime Claims and Asset Forfeiture Actions, 18 U.S.C. § 981(d), 21 U.S.C. § 881(e), and other applicable laws.

WHEREFORE, Plaintiff prays that due process issue to enforce the forfeiture of the Defendant Currency, *in rem*; that a Warrant for the Arrest of the Defendant Currency be issued; that due Notice be given to all interested persons to appear, make claim, answer and show cause why the forfeiture should not be decreed; that the Defendant Currency be decreed condemned and forfeited to the United States of America for disposition according to law; and that Plaintiff have

14

such other and further relief as the Court may deem just and proper, together with the costs and disbursements of this action.

> Respectfully submitted,
>
> ADAIR F. BOROUGHS
> UNITED STATES ATTORNEY
>
> By:   *s/Carrie Fisher Sherard*
> Carrie Fisher Sherard #10134
> Assistant United States Attorney
> 55 Beattie Place, Suite 700
> Greenville, SC 29601
> (864) 282-2100

August 8, 2024